# Exhibit 1

BENJAMIN B. WAGNER
United States Attorney
MICHAEL D. ANDERSON
Assistant United States Attorney
501 I Street, Suite 10-100
Sacramento, CA  95814
Telephone:  (916) 554-2700
Facsimile:  (916) 554-2900

**FILED**

MAY 17 2012

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
                    DEPUTY CLERK

Attorneys for the United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

                        Plaintiff,

v.

DANIEL CHARTRAW,

                        Defendant,

CASE NO. **2:12 - CR - 0 1 8 4 WBS**

VIOLATION:  18 U.S.C.  § 1343 –
WIRE FRAUD (18 COUNTS)

INDICTMENT

COUNTS ONE THROUGH EIGHTEEN:    [18 U.S.C. § 1343 – Wire Fraud]

The Grand Jury charges:

DANIEL CHARTRAW,

defendant herein, as follows:

I.  INTRODUCTION

At all times relevant to the indictment:

1.    Defendant DANIEL CHARTRAW is an individual with a primary residence in El Dorado County, California, until late 2010, at which time he moved to Monterey County.

2.    Geneva Capital Solutions, Grande Armi, LLC, Geneva Prestige Global Group, LLC, and Geneva Partners, LLC, are entities in which defendant CHARTRAW had an ownership and management interest that purport to deal in investments in mining, precious metals and other

1

investments. Geneva Capital Solutions has a Wells Fargo bank account located in El Dorado County, California. In fact, these entities appear to be shell companies with no employees and no assets.

3. Defendant CHARTRAW maintained personal and/or business bank accounts with J.P. Morgan Chase, El Dorado Savings Bank, and Wells Fargo in the Eastern District of California.

4. The Darwin Mine is a mine owned by J.S. that is located in California, near the Nevada border. The Darwin Mine was neither owned nor managed by defendant CHARTRAW.

5. The Miller's Mill is a facility that refines mined minerals that is located in Nevada. J.S. had an option to purchase the Miller's Mill. The Miller's Mill was neither owned nor managed by defendant CHARTRAW.

6. AZ Rock Holdings ("AZ Rock") is a mining company based in Arizona. AZ Rock was neither owned nor managed by defendant CHARTRAW or by L.G.

7. Cascabel Bank is a shell company that is not licensed to operate as a financial institution of any kind.

## II. SCHEME TO DEFRAUD

8. Beginning on a date unknown to the Grand Jury, but not later than on or about January 1, 2007, and continuing to and including on or about November 31, 2011, in the State and Eastern District of California and elsewhere, defendant knowingly devised, participated in, and executed a material scheme to defraud and to obtain money by means of materially false and fraudulent pretenses, representations and promises, and the concealment of material facts.

9. The purpose of the scheme was to obtain money from individuals in the form of loans, investments and the purchase of various types of commodities. In all cases, defendant CHARTRAW had neither the intention, ability, expertise, or financial means to repay the loans or to perform on the promises that he made to prospective investors.

10. Between in or about February 2007 and November 2011, CHARTRAW collected approximately $2.4 million from investors.

////

////

2

### III. MANNER AND MEANS

11. The Darwin Mine Fraud

a.    Between in or about late 2007 and in or about January 2008, defendant CHARTRAW approached an investment company located in San Francisco, California, seeking a $15 million loan.

b.    In connection with the loan request, defendant CHARTRAW made the following false and fraudulent statements of material fact to T.F., a partner in the investment company:

(1)    That he owned a company that had an ownership interest in the Darwin Mine;

(2)    That he had an ownership interest in Miller's Mill;

(3)    That he had a current net worth in excess of $75 million;

(4)    That the purpose of the loan was to permit the Darwin Mine and Miller's Mill to resume operations;

(5)    That he was pursuing financing for equipment to be used at the mine, that he intended to use the loan proceeds to make payments related to mining equipment, and that as security for the loan he intended to record liens on real property in favor of T.F.

c.    Based on the foregoing representations, T.F. extended a $75,000 loan to defendant CHARTRAW, which defendant CHARTRAW used for his own personal expenses.

12. The Oil Broker Fraud

a.    In approximately March 2009, defendant CHARTRAW fraudulently obtained $25,000 each from A.R. and P.W. by claiming that he could help them become brokers of oil and refined oil commodities.

b.    In connection with this transaction, defendant CHARTRAW made the following false and fraudulent statements of material fact to A.R. and P.W.:

(1)    That in return for $50,000, he would set up bank accounts in their names into which he would deposit $100 million so A.R. and P.W. could build credibility as high asset individuals;

3

(2)     That the $50,000 provided by A.R. and P.W. would be placed in segregated accounts that would not be drawn upon for any purpose;

(3)     That the $50,000 provided by A.R. and P.W. would be secured by a promissory note signed by S.L., when, in fact, S.L.'s signature was forged;

c.     Based on the foregoing representations, A.R. and P.W. each gave $25,000 to Geneva Capital Solutions, LLC, an entity controlled by defendant CHARTRAW, which defendant CHARTRAW then proceeded to use for his own personal expenses.

13.     Fraud Involving Contract for Sale of "Concentrate"

a.     In approximately March 2009, defendant CHARTRAW fraudulently obtained $25,000 from M.H. and $75,000 from R.M. by entering into a contract to sell 180 barrels of "concentrate" to them that defendant Chartraw claimed contained precious metals.

b.     In connection with this transaction, defendant CHARTRAW made the following material false and fraudulent statements of material fact to M.H. and R.M.:

(1)     That his company, Geneva Prestige Global Group, LLC, owned the 180 barrels of concentrate;

(2)     That the concentrate was insured by a $20 million insurance policy with Lloyds of London that guaranteed the value of the solution;

(3)     That the assays he provided to M.H. and R.M. were true and correct and showed that the barrels were valuable;

(4)     That he would retain the money from M.H. and R.M. as a refundable deposit pending their testing of the viability of the concentrate;

c.     Based on the foregoing representations, M.H. and R.M. gave $25,000 and $75,000 respectively to Geneva Prestige Global Group, LLC, an entity controlled by defendant CHARTRAW, which defendant CHARTRAW then proceeded to use for his own personal expenses.

14.     The Dairy Financing Fraud

a.     In or about October 2009, defendant CHARTRAW fraudulently obtained $200,000 from W.V.B., an owner and operator of dairies who was in the process of raising financing for the development of new dairy properties to be sold to citizens of the Netherlands. Defendant

4

CHARTRAW offered to fund W.V.B. with $250 million from a bank that defendant CHARTRAW claimed he controlled, but required that W.V.B. first wire him $200,000 as an advanced fee.

        b.     In connection with this transaction, defendant CHARTRAW made the following material false and fraudulent statements of material fact to W.V.B.:

        (1)     That he owned a licensed and operational offshore bank;

        (2)     That he had a genuine 1.5 billion Euro Certificate of Deposit from Cascabel Bank that would allow him to finance W.V.B.'s investment;

        (3)     That the Certificate of Deposit could be placed with a bank in order to back a "trading program" that would generate sizable returns;

        c.     Based on the foregoing representations, W.V.B. gave defendant CHARTRAW $200,000, which defendant CHARTRAW then proceeded to use for his own personal expenses.

15.    The Gold Refinery Financing Fraud

        a.     In on or about November 2009, defendant CHARTRAW fraudulently obtained $100,000 from D.G. as an advanced fee for defendant CHARTRAW's promise that he would secure up to $10 million in funding from Cascabel Bank for D.G. to build a gold refinery.

        b.     In connection with this transaction, defendant CHARTRAW made the following material false and fraudulent statements of material fact to D.G.:

        (1)     That he owned an interest in Cascabel Bank, a licensed and operational offshore bank;

        (2)     That he would use the $100,000 provided by D.G.to obtain funding for D.G;

        (3)     That he owned a 50% interest in the AZ Rock Mine in Arizona;

        c.     Based on the foregoing representations, D.G. gave defendant CHARTRAW $100,000, which defendant CHARTRAW then proceeded to use for his own personal expenses.

16.    The Dore Bar Fraud

        a.     In or about November 2010 through in or about March 2011, defendant CHARTRAW and L.G., fraudulently obtained $1 million from J.F.C., in exchange for the purchase of "dore bars" from AZ Rock Holdings ("AZ Rock"), which defendant CHARTRAW claimed contained precious metals.

5

b.     In connection with this transaction, defendant CHARTRAW made the following material false and fraudulent statements of material fact to J.F.C.:

(1)     That he and L.G. were officers of AZ Rock with authority to act on behalf of that company;

(2)     That the $1 million provided by J.F.C. would be placed in an escrow account in the name of L.G., omitting to tell J.F.C. that that account was actually controlled by defendant CHARTRAW and L.G.;

(3)     That the $1 million provided by J.F.C. would be used to purchase "dore bars" from AZ Rock;

c.     To further induce J.F.C. to go forward with this investment, defendant CHARTRAW represented to J.F.C. that his money would be safely held in an escrow account at J.P. Morgan Chase Bank in the name of 1st National Title Insurance Agency (1st National). However, after the transfer of the J.F.C.'s funds to that account defendant CHARTRAW and L.G. provided, or caused to be provided, to 1st National a materially false and forged "Letter of Introduction and Mandate Authority" purporting to be from AZ Rock. This letter fraudulently listed defendant CHARTRAW as a "Principle/Partner" in AZ Rock and contained the defendant's signature and the forged signature of L.N., the true owner of AZ Rock. The letter also falsely purported to give L.G. authority to act on behalf of AZ Rock. In reliance on this letter, between on or about November 22, 2010, and on or about March 16, 2011, 1st National disbursed the funds from the escrow account to personal accounts controlled by defendant CHARTRAW and L.G., and to an attorney client trust account maintained by attorney J.H. on behalf of defendant CHARTRAW. Thereafter, defendant CHARTRAW and L.G. used these funds for their own personal expenses.

17.     The "Trading Platform" Fraud

a.     In or about February 2010, defendant CHARTRAW fraudulently obtained $113,258.30 from G.A. by fraudulently telling G.A. that he would invest the money on G.A.'s behalf in a "trading platform" at a bank where it would generate 15% interest every 30 days before being returned after 90 days.

b.   In connection with this transaction, defendant CHARTRAW made the following material false and fraudulent statements of material fact to G.A.:

(1)   That such "trading platforms" exist when in truth and in fact as defendant knew such investments do not exist;

(2)   That G.A.'s money would be added to a pool of money that defendant CHARTRAW already had invested in this "trading platform";

(3)   That G.A.'s money would remain available to him to withdraw at any time;

c.   Based on the foregoing representations, G.A. gave defendant CHARTRAW $113,258.30, which defendant CHARTRAW then proceeded to use for his own personal expenses.

18.   The Gold Refining Equipment Loan Fraud

a.   Between in or about April 2011 and in or about June 2011, defendant CHARTRAW, fraudulently obtained loans of $50,000 from J.K., $25,000 from J.C., and $75,000 from H.G.

b.   In connection with these loans, defendant CHARTRAW made the following material false and fraudulent statements of material fact to J.K., J.C., and H.G.:

(1)   That he was a wealthy individual who was asset rich, but cash poor;

(2)   That he owned a gold mine;

(3)   That he had a lease on a piece of gold refining equipment;

(4)   That he intended to use the borrowed money to make a lease payment on a piece of gold refining equipment:

(5)   That in return for the loans defendant CHARTRAW would transfer a quantity of gold to J.C. as collateral and repay the loan plus six percent interest within five days;

(6)   That he had actually shipped a quantity of gold to J.C. to act as collateral for J.C. and H.G.'s loans;

c.   In furtherance of the scheme to defraud, defendant CHARTRAW provided H.G. with a document purporting to be a Bill of Lading fraudulently representing that the defendant had shipped a quantity of gold to J.C. via Hellman Worldwide logistics.

d. Based on the foregoing representations, J.K., J.C., and H.G. provided money to defendant CHARTRAW, which defendant CHARTRAW then proceeded to use for his own personal expenses.

19. The Movie Production Fraud

a. In or about January 2010, defendant CHARTRAW fraudulently obtained $100,000 from S.F., a movie producer who was seeking financing for a movie. Defendant CHARTRAW offered to fund S.F.'s movie production in the initial amount of $500,000 with a further agreement to provide $350 million in funds; however, defendant CHARTRAW stated that he would need a $100,000 fee from S.F. in order to allow the use of a $100 million certificate of deposit in order to generate revenue for the financing.

b. In connection with this transaction, defendant CHARTRAW made the following material false and fraudulent statements of material fact to S.F.:

(1) That he had a genuine $100 million certificate of deposit with Cascabel Bank;

(2) That he would use the $100,000 from S.F. for fees associated with the $100 million certificate of deposit;

(3) That the certificate of deposit could be used in a "trading program" between banks;

(4) That defendant CHARTRAW intended to return S.F.'s $100,000 on or about January 11, 2010

c. Based on the foregoing representations, S.F. provided $100,000 to defendant CHARTRAW, which defendant CHARTRAW then proceeded to use for his own personal expenses.

III. USE OF INTERSTATE WIRES

20. On or about the dates listed below, in the State and Eastern District of California, for the purpose of executing the aforementioned scheme and artifice to defraud, and attempting to do so, the defendant, as more specifically set forth below, knowingly transmitted and caused to be transmitted by means of wire communication in interstate commerce certain writings, signs, signals, pictures and sounds.

8

| COUNT | DATE OF WIRE | WIRE AMOUNT | VICTIM | SENDER ACCOUNT ENDING | RECEIVER ACCOUNT ENDING |
|---|---|---|---|---|---|
| 1 | December 20, 2007 | $50,000 | T.F. | Wells Fargo Bank -3907 | El Dorado Savings Bank -1110 |
| 2 | January 24, 2008 | $25,000 | T.F. | Wells Fargo Bank -3907 | El Dorado Savings Bank -1110 |
| 3 | March 3, 2009 | $25,000 | A.R. | CitiBank, NA -0593 | Wells Fargo Bank -5565 |
| 4 | March 3, 2009 | $25,000 | P.W. | RaboBank -6201 | Wells Fargo Bank -5565 |
| 5 | March 20, 2009 | $25,000 | M.H. | Ensign Federal Credit Union -2334 | Wells Fargo Bank -5565 |
| 6 | March 27, 2009 | $75,000 | R.M. | JP Morgan Chase Bank -7316 | Well Fargo Bank -5565 |
| 7 | November 6, 2009 | $200,000 | W.V.B | Rabobank -7242 | City National Bank -2036 |
| 8. | November 20, 2009 | $100,000 | D.G. | JP Morgan Chase Bank -1241 | JP Morgan Chase Bank -9335 |
| 9 | November 22, 2010 | $400,000 | J.F.C. | JP Morgan Chase Bank -3443 | JP Morgan Chase Bank -9731 |
| 10 | December 23, 2010 | $5,000 | J.F.C. | JP Morgan Chase Bank -3443 | JP Morgan Chase Bank -9335 |
| 11 | December 31, 2010 | $5,000 | J.F.C. | JP Morgan Chase Bank -3443 | JP Morgan Chase Bank -9335 |
| 12 | January 14, 2011 | $10,000 | J.F.C. | JP Morgan Chase Bank -3443 | JP Morgan Chase Bank -9335 |
| 13 | January 26, 2011 | $5,000 | J.F.C. | JP Morgan Chase Bank -3443 | JP Morgan Chase Bank -9335 |
| 14 | March 16, 2011 | $8,000 | J.F.C. | JP Morgan Chase Bank -3443 | JP Morgan Chase Bank -9335 |
| 15 | February 1, 2010 | $113,800 | G.A. | Wachovia Bank NA -5092 | JP Morgan Chase Bank -9335 |
| 16 | November 4, 2009 | $30,000 | S.F. | Wells Fargo Bank -2849 | Wells Fargo Bank -1519 |
| 17 | April 11, 2011 | $50,000 | J.K. | HSBC Bank -1220 | JP Morgan Chase Bank -9731 |
| 18 | June 7, 2011 | $75,000 | H.G. | TD Ameritrade -8855 | JP Morgan Chase Bank -9731 |

All in violation of Title 18, United States Code, Sections 1343 and 2.

A TRUE BILL.

/s/ Signature on file w/AUSA

FOREPERSON

BENJAMIN B. WAGNER
United States Attorney

9

# UNITED STATES DISTRICT COURT

*Eastern District of California*

*Criminal Division*

## THE UNITED STATES OF AMERICA

*vs.*

### DANIEL CHARTRAW

## I N D I C T M E N T

**VIOLATION:** 18 U.S.C. § 1343 - Wire Fraud (18 Counts)

*A true bill,*

*/s/*

*Foreman.*

*Filed in open court this* ____ *17Th* _____ *day*

*of* ___ May _____ , *A.D. 20* 12 __

M. Caspu

*Clerk.*

*Bail, $* ___ **NO PROCESS NECESSARY**

GPO 863 525

2:12 - CR - 0 1 8 4 WBS

PENALTY SLIP
**DANIEL CHARTRAW**

COUNTS 1-18:

VIOLATION: 18 U.S.C. § 1343 - Wire Fraud

PENALTY:     Not more than 20 Years Imprisonment,
             $250,000 Fine or both;
             3 Years TSR

PENALTY
ASSESSMENT:     $100 each count

2 1 2 - CR - 0 1 8 4 WBS