ERIC GRANT
United States Attorney
JESSICA DELANEY
J. DOUGLAS HARMAN
Assistant United States Attorneys
501 I Street, Suite 10-100
Sacramento, CA 95814
Telephone: (916) 554-2700
Facsimile: (916) 554-2900

Attorneys for Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 2:24-CR-000311 WBS |
| Plaintiff, | **UNITED STATES' TRIAL BRIEF** |
| v. | |
| DANIEL CHARTRAW, | DATE: April 28, 2026 |
| Defendant. | TIME: 9:00 a.m. |
| | COURT: Hon. William B. Shubb |

## I.     INTRODUCTION

The United States respectfully submits this Trial Brief to assist the Court. It sets forth a summary of the facts, a discussion of the elements of the charged offenses, and an overview of anticipated issues at trial. This matter is set for jury trial on April 28, 2026, and is expected to last no more than two weeks.

## II.     THE INDICTMENT

The indictment charges Daniel Chartraw with twelve counts of wire fraud, in violation of 18 U.S.C. § 1343.

## III.     FACTUAL BACKGROUND

At trial, the government anticipates establishing the following facts, among others:

### A.     Defendant Exercises Control Over Crypto-Pal and TDA Global

At all relevant times, Defendant and an associate, Todd Owen, controlled multiple businesses,

UNITED STATES' TRIAL BRIEF

1

including Crypto-Pal LLC and TDA Global LLC.  Defendant and others associated with the companies represented that Crypto-Pal was a web-based company that assisting investors with cryptocurrency trading.  Defendant represented that investing with Crypto-Pal would guarantee high returns and had no risks.  Defendant represented that TDA Global was an umbrella or parent company, over several subsidiaries including, at times, Crypto-Pal.  At other times, Defendant represented that TDA Global was a firm engaged in business ventures, including supplying jet fuel to airlines, and at other times Defendant represented that TDA Global was itself a cryptocurrency trading firm.

Defendant communicated with potential investors through phone calls, text messages, and meetings using web-based platforms such as Microsoft Teams and Zoom.  Defendant also used his personal email account, and various business email accounts in both his name, and the name of his father, Leonard.

Defendant told numerous people working for him that he could not have his name associated with the companies, but needed to use the alias of Leonard, or Leon.  Defendant told his associates this was because he had previously been convicted of fraud, and if investors knew of his conviction, they would be less likely to invest.  Nonetheless, many of the investors became aware that Defendant was controlling the accounts and the businesses, and not Leonard.

Defendant also exercised control over bank accounts that his father signed as a signatory.  For example, Crypto-Pal established a business bank account.  Defendant was not a signatory to the account.  Nonetheless, Defendant repeatedly accessed the account to withdraw cash, make purchases, and transfer funds.

**B.    Defendant Defrauds Samir Patel and Chad Collier**

In the late winter or early spring of 2021, Defendant and Owen began the Crypto-Pal business.  They worked with a developer in Mexico to develop a cryptocurrency bot.  They also partnered with Clayton Porscha, who was familiar with start-up businesses and agreed to assist them.  Porscha was instrumental in setting up a bank account for the fledgling company, developing promotional material, ensuring that legal documents were created, and soliciting early investors.

Porscha communicated regularly with Defendant, who was the primary director of operations.  Porscha suggested finding investors to build capital.  Porscha then reached out to several investors in

Tennessee, who were interested in cryptocurrency trading. These investors included Sam Patel and Chad Collier.

The Tennessee investors were interested in becoming early investors in the company and agreed to transfer money to the company.  They did so in part based upon the positive representations made by Porscha about the success of the company.  Porscha obtained the information on the company's success from either Defendant or the developer in Mexico.  In making the decision to invest, the Tennessee investors had a series of meetings with Defendant, Porscha, and others. In these meetings, Defendant, Porscha, and others represented to the Tennessee investors that: (1) if they invested money into the Crypto-Pal company itself, they could receive equity in the company, (2) if the Crypto-Pal company did not grow as expected, they were guaranteed a return of their investment, and (3) their investment would be used solely to develop additional technology and to further the business of Crypto-Pal and not for the purchase of real property or personal.  They negotiated a contract ensuring that their investment would be used for cryptocurrency trading or the operation of the business.   They did not authorize their funds to be used for funding personal expenses or travel.

The investors understood that Porscha was not the sole actor for Crypto-Pal, and that Defendant was a founding member.  The investors were also on several virtual calls involving Porscha and other members of the company, including Defendant.  Porscha routinely informed them that he needed to contact Defendant or Owen before committing to any agreements.

Collier and Patel invested because they trusted the representations made by Porscha and Defendant on the positive future for Crypto-Pal and believed the representation that the funds would be used for the development of technology and the company.   In May 2021, Patel invested $23,978.61, and Collier invested $80,541.64 in the form of convertible notes for equity in Crypto-Pal.  Porscha signed the agreement on behalf of Crypto-Pal.

After the funds were transferred, they were not used for the purposes guaranteed to the investors.  Instead, Defendant rapidly diverted Collier's and Patel's money from the company account to his personal bank accounts and crypto wallets, where he spent the money on personal expenses.  There were also rapid and repeated cash withdrawals of the funds.

Porscha eventually left Crypto-Pal.

UNITED STATES' TRIAL BRIEF

3

In summer 2021 Tennessee investors, Collier and Patel realized that Crypto-Pal was not performing as expected and requested a return of their investment as guaranteed by the agreement.  The investors reached out to Defendant about the return of capital, recognizing that he was an operational head of the company.  Defendant told Collier he would meet him in Florida to discuss the status of the investment.  However, Defendant failed to show up for the meeting and then stopped communicating with the investors entirely.

### C.    Defendant Defrauds Alison Hitz-Vukich and Christian Morton

Defendant first met Morton at a conference and the two started regularly corresponding about various business ventures.  In spring 2021, Defendant told Morton about his new business, Crypto-Pal. Defendant met Morton in person to discuss the company.  Morton was excited about the potential of the company, and discussed the company with his girlfriend, Alison Hitz-Vukich.  She also expressed an interest in investing her money with the company.

Defendant and others met with Hitz-Vukich to discuss her investment with Crypto-Pal. Defendant represented himself as having a liaison role in the company.  Defendant sent Hitz-Vukich promotional material and made promises about how her money would be invested by Crypto-Pal. Defendant promised, among other things, that: (1) investment principal would be maintained in a bank account that was not subject to any risk, (2) only profits generated would be subject to loss risk, (3) Crypto-Pal's algorithm would result in significant gains without risk to investment principal; (4) investment money was being pooled with other investment money to provide even higher gains; (5) investment funds would be used solely for cryptocurrency trading; and (6) Crypto-Pal would provide regular statements of investment value.

Based on these promises, Hitz-Vukich transferred $44,000 of funds to the Crypto-Pal Bank of America account.  Defendant promptly took Hitz-Vukich's investment and withdrew money through various check card withdrawals and ATM withdrawals.  None of the funds were invested in cryptocurrency trading, as promised.

After this, Defendant represented to Hitz-Vukich that her investment had grown dramatically. Based upon Defendant's representations, Hitz-Vukich invested an additional $125,000, and Morton invested $25,000.  Morton and Hitz-Vukich wired their money to the Crypto-Pal Bank of America

UNITED STATES' TRIAL BRIEF

4

account.

Defendant then took these new investments by Hitz-Vukich and Morton out of the Crypto-Pal account and relocated most of it into accounts he personally controlled. The money was not invested in cryptocurrency trading as promised. Defendant continued to represent that Hitz-Vukich's investment was growing in value and sent her emails and PowerPoint slides with those representations. For example, on September 17, 2021, he sent her an email, purporting that it was sent by his father, describing the growth in her investment.

When Hitz-Vukich then requested to withdraw funds from her "investment," Defendant minimized his role, claiming that he did not have access to invested funds. When Hitz-Vukich and Morton continued to press, Defendant continued to lie and make excuses about why the funds could not be transferred. After months of excuse-making and delay, including a threat by Defendant to sue Hitz-Vukich for defamation, Defendant severed all contact. Neither Hitz-Vukich nor Morton ever received any of their money back or any returns on their supposed investments.

### D.    Defendant Defrauds Jennifer Tate

Defendant next defrauded Jennifer Tate, beginning in around October 2021. Jennifer Tate worked with Defendant's mother, Louise Chartraw, to settle the estate of her recently deceased father. Louise encouraged Tate to invest with Defendant's company as a way to make guaranteed money. When Tate met Defendant, he and Louise made representations to her that she'd be investing money into one of Defendant's companies, TDA Global, that operated a cryptocurrency trading service with guaranteed returns. Based on these representations, Tate made a series of bitcoin transfers to cryptocurrency wallets controlled by Defendant. Tate did so for the purpose of Defendant investing the funds in cryptocurrency trading. Instead, Defendant transferred the funds to his personal Bank of America account and transferred some to an associate who ultimately withdrew it as fiat (cash) money. Defendant never invested the money as promised to Tate. When Tate attempted to recover her money, Defendant ceased all communication with her. Tate never received any of her money back, or any returns on her supposed investment.

### E.    Defendant Defrauds Trisha Hamiton and Tom Harlan

In fall 2021, Defendant asked Trisha Hamilton to invest in his company, TDA Global.

Defendant met Hamilton through an introduction by Kellee Koeppen, who was Defendant's girlfriend at the time.  Defendant represented that TDA was engaged in a number of ventures, including in the cybersecurity area.  He told Hamilton that he needed a woman investor for certain government subsidies, or words to that effect.  He told her that she could invest $50,000 in exchange for equity in his company.  He also told her that her investment was significantly below what was normally required for equity.  Based on Defendant's promises, Hamilton invested the $50,000 Defendant requested.

Defendant also encouraged her husband, Thomas Harlan, to work for TDA Global.  However, Harlan was never paid for his work, despite an understanding that he would be.  Eventually, the couple were having financial difficulties, in part because Harlan had quit his former job to work for TDA Global but was not being paid.  Hamilton requested a return of her investment.  Initially, Defendant did not return any money, at which point Hamilton began pressing Koeppen and asking for help.  Eventually, Defendant transferred funds that were the proceeds of another fraud to repay the debt.

### F.      Defendant Defrauds Jarnell Stokes

Finally, Defendant defrauded Jarnell Stokes, a former NBA player looking to obtain returns on investments in cryptocurrency.  Stokes met the defendant through several mutual associates, and Defendant made various fraudulent representations to Stokes about investing.  Defendant represented that his company, TDA Global, operated a cryptocurrency trading platform, and promised Stokes that his money would triple using TDA's system.  Defendant told Stokes he could then use that money to invest in a National Basketball Association (NBA) venture related to a professional basketball team moving to Las Vegas.  Defendant also represented that Stokes would be investing with William Murphy, who was affiliated with a bank and could secure Stokes' investment.  Defendant met with Stokes in person and also communicated with him over the phone.

Stokes invested by making a series of bitcoin transactions into a cryptocurrency wallet Stokes believed belonged to Murphy or Murphy's bank.  In reality, the wallet belonged to Defendant.  Defendant rapidly transferred the funds to another associate, to his girlfriend, and to various bank accounts under his control.  Stokes' money was never invested in cryptocurrency trading as Defendant had promised.  Stokes never received a return on his investment or any of his money back.  When Stokes attempted to obtain answers about his investment, or to receive a return of the investment,

UNITED STATES' TRIAL BRIEF

6

Defendant directed him to other people he claimed were responsible, and eventually stopped communicating with Stokes entirely.  Stokes never received any money back, or any returns on his investment.

**IV.    SUBSTANTIVE LAW**

**A.    Wire Fraud, 18 U.S.C. § 1343**

Defendant is charged in Counts One through Twelve with wire fraud.  Wire fraud has four elements:

(1) Defendant knowingly participated in, devised, or intended to devise a scheme or plan to defraud for the purpose of obtaining money or property by means of false or fraudulent pretenses, representations, or promises;

(2) The statements made as part of the scheme were material; that is, they had a natural tendency to influence, or were capable of influencing, a person to part with money or property;

(3) Defendant acted with the intent to defraud, that is, the intent to deceive and cheat; and

(4) Defendant used, or caused to be used, an interstate wire communication to carry out or attempt to carry out an essential part of the scheme.

Ninth Circuit Model Jury Instruction 15.35.

**B.    Intent to Defraud**

Intent to defraud requires proving "the intent to deceive *and* cheat" or, in other words, intent "to deprive the victim of money or property by means of deception."  *United States v. Miller*, 953 F.3d 1095, 1103 (9th Cir. 2020) (emphasis in original).  The government, however, does not need to prove intent to "permanently deprive" the victim of the money or property.  *Id.*  "Intent to repay, therefore, is not a defense to wire fraud."  *Id.*

The government may prove the intent to defraud through direct evidence or inferences based on "the defendant's statements and conduct."  *United States v. Beecroft*, 608 F.2d 753, 757 (9th Cir. 1979).  For example, the government can show that the defendant "knowingly made false representations" or show that "the scheme was reasonably calculated to deceive persons of ordinary prudence and comprehension."  *Id.* at 757.  The government, however, is not required to prove that the victims are persons of ordinary prudence and comprehension.  *United States v. Ciccone*, 219 F.3d 1078, 1083 (9th

Cir. 2000).

### V.      GOVERNMENT'S CASE-IN-CHIEF

The government anticipates calling five categories of witnesses.  The first category consists of Defendant's investor-victims: Chad Collier, Trisha Hamilton, Alison Hitz-Vukich, Christian Morton, Samir Patel, Jarnell Stokes, and Jennifer Tate.  The second consists of individuals involved in Defendant's fraudulent venture, often without knowledge of its fraudulent nature, including Caleb Moretti, Thomas Harlan, Rosemary Hennessy and Clayton Porscha.[1]  The third consists of individuals who were involved in and aware of the various companies but did not themselves invest money, including Matthew Houston, and Melissa Kraczek.  The fourth consists of representatives from Google, Coinbase, and Fedwire Funds Service to provide testimony regarding the interstate nature of the wires involved in this case.[2]  Finally, the government may also call law enforcement witnesses, such as the case agent, FBI Special Agent Christifer Tomoson, FBI Forensic Accountant Aleksandr Legkiy, FBI Special Agent Nicholas Phirippidis, and FBI Senior Digital Forensic Examiner Tanya Konrad.

At this time, the government has not finalized its witness order.

### VI.      EVIDENTIARY ISSUES

#### A.      Hearsay and Applicable Exceptions

Hearsay is an out of court statement used to prove the truth of the matter asserted in the statement.  Fed. R. Evid. 801.  While hearsay is generally inadmissible (Fed. R. Evid. 802), the government anticipates introducing various out-of-court statements that either fall outside the definition of hearsay or fit into an exception allowing admission of the statement.

#### 1.      Statement of Party Opponent

When offered by the government, a defendant's statements are not hearsay and are admissible. Fed. R. Evid. 801(d)(2)(A).  However, a defendant cannot introduce his own statements through the testimony of other witnesses because defendant's statements are not a statement of a party opponent when offered by the defendant.  *See, e.g., United States v. Mitchell*, 502 F.3d 931, 964 (9th Cir. 2007).

---

[1] Many of these individuals were also victims of Defendant's fraud, either by their own investments, or by working for the company without ever receiving promised salaries or promised equity in the company.

[2] These witnesses may not be called if the parties can agree on stipulations as to this element.

UNITED STATES' TRIAL BRIEF

### a.      Defendant's Statements Offered by the Government

The government anticipates introducing statements made by Defendant.  There are four main buckets from which these statements are drawn: text messages sent by Defendant, email communications sent by Defendant, oral statements made by Defendant to witnesses, and the factual basis of Defendant's plea agreement to a 2011 fraud charge.  Defendant's statements will be introduced through introduction of the written statements and witness testimony.

### b.      The Defense may not Introduce Additional Self-Serving Statements

The fact that the government introduces a portion of a recorded statement does not mean that the defense may then introduce the totality of the statement under the Rule of Completeness.

The Rule of Completeness provides that where a statement is admitted into evidence, "an adverse party may require the introduction" of another part of that statement or any other statement "that in fairness ought to be considered." Fed. R. Evid. 106.  The rule addresses a concern for "the misleading impression created by taking matters out of context." *United States v. Collicott*, 92 F.3d 973, 983 (9th Cir. 1996) (quoting Fed. R. Evid. 106 advisory committee's note to 1972 proposed rule).  It "applies only to the narrow circumstances in which a party has created a misimpression about the statement." Fed. R. Evid 106 advisory committee notes to 2023 amendments.

In short, the Rule of Completeness does not "require the introduction of *any* unedited writing or statement merely because an adverse party has introduced an edited version." *United States v. Vallejos*, 742 F.3d 902, 905 (9th Cir. 2014) (emphasis in original).  Nor does it allow an adverse party to require an introduction of additional parts of a transcript in order to show a "flavor of the interview," to "humanize" a defendant, to prove character, or to convey voluntariness or sympathy. *Id.*

### 2.      Statements Introduced to Show Effect on the Listener

"Out-of-court declarations introduced to show the effect on the listener are not hearsay." *Los Angeles News Service v. CBS Broadcasting*, 305 F.3d 924, 935 (9th Cir. 2002).  Therefore, such declarations, if not admitted for the truth of the matter they assert, but rather to show how or why a party took certain actions or acted in a certain manner, are admissible. *See United States v. Payne*, 944 F.2d 1458, 1472 (9th Cir. 1991).

In this case, the government intends to introduce text messages and emails sent by Clayton

UNITED STATES' TRIAL BRIEF

9

Porscha and Todd Owen to various investor-victims discussing refunds of their investments. The content of these messages states or implies that Defendant controlled the investments and money, and Defendant needed to provide the refunds to the investor-victims. These communications are not offered for the truth of the matter asserted, but rather explain why investor-victims subsequently contacted Defendant to request repayment and why they became suspicious when Defendant implicated Porscha and Owen when explaining why repayment could not be made. In addition, Defendant is included in the email line of the messages. Thus, these messages also provided notice to Defendant of the concerns or questions being asked by investor-victims.

Additionally, Hitz-Vukich will likely testify that she confronted Defendant about his criminal history. This statement is not offered for the truth of the matter, but to as effect on the listener, and to provide context to Defendant's response that he would sue her for fraud.[3]

### 3.    Statements of Independent Legal Significance

"[A] legally operative document that defines the rights and liabilities of the parties" is not hearsay. *Stuart v. UNUM Life Ins. Co. of America*, 217 F.3d 1145, 1154 (9th Cir. 2000). These documents have "independent legal significance regardless of the truth of any assertions made in" them. *Kalasho v. BMW of North America, LLC*, 520 F.Supp.3d 1288, 1293-94 (S.D.Cal. 2021). In the criminal context, this concept has been used to find that a bank's FDIC insurance certificate (*United States v. Bellucci*, 995 F.2d 157, 161 (9th Cir. 1993)) and a witness' immunity agreement (*United States v. Rubier*, 651 F.2d 628, 630 (9th Cir. 1981)) are not hearsay.

In this case, the government anticipates introducing various agreements between parties, including investment agreements, employment agreements, articles of organization for TDA Global, and promissory notes. These agreements have independent legal significance because they define terms under which Crypto-Pal and TDA Global had to operate regarding investments and employment

---

[3] Such evidence is also admissible under the Fed. R. Evid. 403 balancing test. While ordinarily such evidence would be more prejudicial than probative, here information about Defendant's previous fraudulent conduct is independently admissible as direct evidence of the scheme (he used his father's alias in order to avoid others finding out about his criminal past); and as 404(b) evidence both to establish the motive behind using his father's name, and as laid out in the government's motion in limine to admit 404(b) and addressed later in the brief. Accordingly, the prejudicial nature of the evidence is minimal. It is probative to establish Defendant's actions in threatening Hitz-Vukich in an attempt to prevent her from reporting the fraud to law enforcement.

agreements, as well as any duties employees or investors had to Crypto-Pal or TDA Global.

### 4.    False Statements

False statements are not hearsay because they are not admitted for the truth of the matter asserted. *See, e.g., United States v. Wellington*, 754 F.2d 1457, 1464 (9th Cir. 1985). Here, the government anticipates admitting various statements and documents concerning the management, activities, and operations of both companies that Defendant used to perpetrate the fraud scheme, TDA Global and Crypto-Pal. Specifically, Defendant and those he was using to further his scheme provided investor-victims with PowerPoint slides purportedly representing the business being done by TDA and Crypto-Pal. Defendant also had a website for TDA, containing assertions about the business of TDA and who ran the company. These documents are relevant, in part, because they distanced Defendant from the companies, and demonstrate his repeated use of his father as a stand-in for his own activities. They also falsely represented that the companies were engaged in various investments and projects that would attract investor-victims. However, these statements were all false because TDA Global and Crypto-Pal were under Defendant's control and were not doing the business that they purported to be doing. These false statements were essential to Defendant's scheme to defraud investor-victims because investor-victims would not have provided Defendant funds but for the lies concerning the operation and management of the companies made by these materials.

Defendant also sent PowerPoint slides and emails providing false information to investor-victims concerning their investments. These slides and emails are false representations because the money had not been invested, and Defendant had already spent the money on personal expenses. The statements are also false because they purport to distance Defendant from the missing funds by using Defendant's alias of Leonard Chartraw and claiming that there were relationships with third parties that did not exist. This distancing from the missing funds was an essential part of Defendant's scheme. These false assertions are also relevant because they were essential to lulling investor-victims and forestalling them from reporting Defendant's scheme to authorities or taking other action that would prevent Defendant's ongoing fraud.

### 5.    Business Records

The Federal Rules of Evidence except business records from the hearsay rule. Fed. R. Evid.

UNITED STATES' TRIAL BRIEF                                        11

803(6). To fit into this exception the record must be "made at or near the time" of the act being recorded by someone with knowledge, the record must be kept in the regular course of business, and the making of the record was a regular practice of the business. Fed. R. Evid. 803(6)(A)-(C). These prerequisites can be established by either a records custodian or a certificate under Federal Rules of Evidence 902(11). Here, the government anticipates introducing various bank records and wire transaction records pursuant to Fed. R. Evid. 902(11). On March 23, 2026, the government filed its motion in limine seeking advance ruling on the admission of business records, and listing those records as identified by their Bates ranges of the documents sent to defense in discovery. That filing provided defense notice of intent to introduce business records pursuant to Fed. R. Evid. 902(11) and identified those 902(11) certificates the government seeks to rely on. Defendant opposed that motion.

### 6.    Public Records

The Federal Rules of Evidence except certain public records from the hearsay rule. Fed. R. Evid. 803(8). Conviction records, including auxiliary records included in conviction paperwork, are self-authenticating under Federal Rule of Evidence 902(2) and 902(4) when certified as correct by a proper custodian. *United States v. Weiland*, 420 F.3d 1062, 1073 (9th Cir. 2005).

Here, defendant's prior guilty plea agreement was filed with the court, and a certified copy was obtained from the clerk of court. The plea agreement is, itself, a public record admissible under Rule 803(8) when appropriately certified under Rule 902. The statements in the factual basis of the guilty plea were signed and adopted by Defendant and are therefore statements of a party opponent when offered by the government against him. *C.f. United States v. Vera*, 893 F.3d 689, 693 (9th Cir. 2018) ("*while the factual basis in a plea agreement binds the party who signed it*, that factual basis carries far less weight against a co-defendant.") (emphasis added).

Here, the government intends to introduce the facts agreed to by Defendant via his prior guilty plea as 404(b) evidence. Admissibility under Rule 404(b) is discussed further below, but Defendant's guilty plea agreement is admissible as a public record, and the statements in the factual basis of that guilty plea are admissible as statements of a party opponent.

Additionally, should Defendant testify, or otherwise place his character at issue, the government also intends to impeach Defendant by admitting the certified copy of Defendant's prior conviction for

wire fraud.  These records are admissible under Rule 803(8) as public records and are self-authenticating because they come certified by the appropriate custodian of records.  The certified copies were previously disclosed to defense counsel in the ordinary course of discovery.

### 7.    Prior Consistent Statements

A declarant-witness's prior statement may be introduced as substantive, non-hearsay evidence when it is consistent with the declarant's testimony and is offered to rebut an express or implied charge of fabrication, or improper motive or influence in testimony or to rehabilitate a declarant's credibility as a witness when attacked on another ground.  Fed. R. Evid. 801(d)(1)(B).

Some witnesses in this case presented testimony to the Grand Jury.  Should the defense elect to attack the credibility of those declarant-witnesses, records of their prior consistent statements may be introduced as non-hearsay, substantive evidence.

### 8.    Use of Summary Charts and Evidence Under Rule 1006

Federal Rule of Evidence 1006 provides that "the contents of voluminous writings, recordings or photographs which cannot be conveniently examined in court may be presented in the form of a chart, summary or calculation."  Fed. R. Evid. 1006.  The Ninth Circuit has recognized that summary evidence "can help the jury organize and evaluate evidence which is factually complex."  *United States v. Shirley*, 884 F.2d 1130, 1133 (9th Cir. 1989) (quoting *United States v. Lemire*, 720 F.2d 1327, 1348 (D.C. Cir. 1983)).  Section 1006 summary exhibits may be admitted into evidence and sent back with the jury.  *United States v. Wood*, 943 F.2d 1048, 1053 (9th Cir. 1991).

To be admissible under Rule 1006, summary evidence must meet three requirements.  First, the underlying evidence must be admissible, although it does not need to be admitted into evidence.  *See United States v. Anekwu*, 695 F.3d 967, 981 (9th Cir. 2012).  Second, this evidence must also be too voluminous to conveniently examine in court.  *Id*.  Third, the summary "must accurately represent the facts that it purports to summarize."  *United States v. Lynch*, 735 F.App'x. 780, 786 (3rd Cir. 2018) (not precedential); *see also United States v. Soulard*, 730 F.2d 1292, 1300 (9th Cir. 1984).  That said, the summaries "may present only one party's side of the case" and need not "reflect all the facts in the case."  *Lynch*, at 786.

Here, the government intends to introduce summary evidence showing how the money sent by

UNITED STATES' TRIAL BRIEF

13

investor-victims was used once received by Defendant and his companies.  Specifically, the summaries will describe the flow of funds from investor-victims through business accounts and into the personal accounts of Defendant and those close to him.  The charts will summarize dozens or of transactions, including numerous cryptocurrency trades and transfers.  The underlying bank and business records are admissible as business records (Fed. R. Evid. 803(6)) and are too voluminous to conveniently examine in court.

Defense counsel will be given the opportunity to review the summary charts and underlying documents in advance of trial.  The summary charts are identified in the Government's Exhibit List as Exhibits 501 through 503C.  The underlying documents were previously provided to defense counsel in the ordinary course of discovery.  The summary charts themselves are have also produced in the ordinary course of discovery, in advance of the production of the clean exhibits for use at trial.  The summary charts indicate which accounts and portions of the discovery they rely on, and defense will be able to use the charts to refer back to the underlying information.

### 9.    Use of Pedagogical Aids Under Rule 611(a)

Federal Rule of Evidence 611(a) permits summaries of already admitted evidence to be used as pedagogical aids during witness testimony and closing argument.  *See United States v. Wood*, 943 F.2d at 1053.  These pedagogical aids are commonly called "demonstratives."  Because a pedagogical aid serves to "illustrate or clarify a party's position," it "may be less neutral in its presentation." *United States v. Milkiewicz*, 470 F.3d 390, 398 (1st Cir. 2006).

In this case, the government anticipates using pedagogical aids during its closing statements, and potentially during the examination of the financial analyst, to summarize the structure and function of Defendant's companies as well as the movement of money from investor-victims to Defendant.  These aids will be based on the content of the Rule 1006 summaries the government will introduce and the content of other admitted exhibits and witness testimony.

### B.    Cross-Examination of the Defendant and Witnesses with Prior Convictions

The scope of cross-examination is within the discretion of the trial court.  Fed. R. Evid. 611(b). A defendant who testifies at trial waives his Fifth Amendment privilege and may be cross-examined as to all matters reasonably related to the issues he puts in dispute, or which are made relevant by his direct

UNITED STATES' TRIAL BRIEF                    14

testimony. *United States v. Black*, 767 F.2d 1334, 1341 (9th Cir. 1985). The cross examination includes the government's "right to challenge the defendant's story on cross-examination" and the right to "impeach the defendant by developing inconsistencies in his testimony." *United States v. Hearst*, 563 F.2d 1331, 1341-42 (9th Cir. 1977).

A testifying witness, including a defendant, can be impeached by their prior felony convictions pursuant to Fed. Rule Evid. 609. However, when using a prior conviction as impeachment, the impeaching party must not "overemphasize" the conviction. *See United States v. Browne*, 829 F.2d 760, 764 (9th Cir. 1987). Questions related to prior convictions should be limited to the fact of the conviction, and a brief mention of the sentence or date of release. *See United States v. Agtuca*, 64 F.3d 667 (9th Cir. 1995) (unpublished).

The Government filed a motion in limine to admit 609 evidence of Defendant's prior fraud conviction, should defendant elect to testify or otherwise place his character at issue. ECF 38. Defendant also filed a motion in limine seeking to exclude 609 evidence of Defendant's prior fraud conviction. ECF 39.

**C.      Scheme Evidence, Defendant's Prior Fraud Scheme, and 404(b) Evidence**

On March 23, 2026, the Government filed a motion in limine seeking the admission of various evidence against Defendant. ECF 38. In its motion, the Government outlined the evidence admissible as direct evidence of the scheme to defraud, as evidence intrinsically intertwined with the fraud scheme, and also that which is otherwise admissible under Fed. R. Evid. 404(b). This motion also served as notice to the defense, as required by the Federal Rules. Defendant did not oppose the motion.

**1.      Evidence Related to Uncharged Investor-Victims and Defendant's Expansive Frauds are admissible to prove Defendant's Scheme to Defraud**

Defendant's false statements about both Crypto-Pal and TDA Global, as well as his employment of various witnesses and distancing himself from the companies were all part of his scheme to defraud and therefore are directly admissible in the government's case-in-chief to prove the first element of the charged offenses. *See* ECF 38 at 14-15. The government anticipates witness testimony and admissible documents to show that Defendant caused additional victims to invest money beyond those specifically identified in the indictment, that his scheme to defraud involved additional wires above and beyond

UNITED STATES' TRIAL BRIEF                    15

those charged, and that he used some of his investor-victims to establish and maintain his credibility against other investor-victims.  This evidence is also inextricably intertwined with the charged evidence, as uncharged investor-victims were defrauded at the same time and using the same methods as the charged wires.  ECF 38 at 14-15.  Some witnesses will also testify that they learned Defendant had a prior conviction for fraud. Defendant informed these witnesses that he had to use his father's name instead of his own, to avoid other people finding out about his fraud conviction.  This is direct evidence of Defendant's scheme to defraud and misrepresent material facts to investor-victims and is therefore admissible.

Even were the court to determine that Defendant's actions weren't direct evidence of or inextricably intertwined with the charged conduct, the evidence is admissible under Rule 404(b) to show defendant's intent, motive, opportunity, knowledge, preparation, plan, *modus operandi*, and absence of mistake.  ECF 38 at 15-24.

**2.      The Actions of Defendant's Prior Fraud Scheme are Admissible Under 404(b)**

The underlying facts behind Defendant's prior conviction constitute admissible evidence under Rule 404(b).  The government seeks to introduce this evidence to prove Defendant's intent, motive, knowledge, absence of mistake, and lack of accident.  ECF 24-26.  Namely, in the prior scheme, Defendant, among other things, used a legitimate mining facility he was not affiliated with to provide credibility to his promises related to mining and mineral extraction, then converted money invested in a putative mining business to his personal use.  ECF 38 at 24-25.  The government will admit these facts using a certified copy of the factual basis in Defendant's prior guilty plea.  The plea agreement itself is admissible as a business record as detailed above.  The statements contained within the factual basis were adopted by Defendant, are binding on him, and therefore do not constitute hearsay.  Because the factual basis in the plea agreement is admissible and self-authenticating, and the facts of the prior fraud scheme go to various permissible uses under Rule 404(b), the government anticipates using evidence of Defendant's prior fraud scheme.

**3.      Inadmissibility of Specific Prior Good Acts of Defendant**

In contrast, the Defendant should be precluded from introducing, attempting to introduce, or

UNITED STATES' TRIAL BRIEF                                    16

mentioning in opening or closing statements, any evidence of prior "good acts" such as specific acts of personal generosity, kindness, or philanthropy.  This evidence is improper character evidence under Federal Rules of Evidence 404 and 405.  Defendant may offer character witnesses and opinion testimony under Rule 405(a), but that provision does not authorize inquiry on direct examination of specific instances of conduct.  Direct examination of specific instances is only authorized where Defendant's pertinent character trait is "an essential element of a charge, claim or defense."  Fed. R. Evid. 405(b).  Even where admissible under Rule 405, evidence must still comport with the standards of relevance and the prohibition against hearsay.  *United States v. Barry*, 814 F.2d 1400, 1404 (9th Cir. 1987).  Here, Defendant is not entitled to introduce or discuss specific prior "good acts" to show his character.

**D.      Expert Testimony and Lay Opinion Testimony by Witness with Special Knowledge**

Pursuant to Fed. Rule Crim. Pro. 16(a)(1)(G), the government has noticed two expert witnesses to the defense: Aleksandr Legkiy, who works as a forensic accountant for the FBI, and Tanya Konrad, a senior forensic examiner for the FBI.  The government reserves the right to call additional expert witnesses should the Defendant raise an issue at trial that has not previously been identified to the government.  Out of an abundance of caution, In an abundance of caution, the government noticed Mr. Legkiy and Ms. Konrad as experts, and has provided or can provide expert certifications to the defense regarding each witness's qualifications, training, and the basis for their anticipated testimony.  However, the government anticipates that they and Mr. Nicholas Phirippidis, another law enforcement witness, will all offer lay opinion testimony based on their training, specialized knowledge, and personal investigation.  *See United States v. Aubrey*, 800 F.3d 1115, 1129–30 (9th Cir. 2015) (witness could testify as to his own personal investigation, including his preparation of summary charts and use of "last-in-first-out" accounting method, without being required to be certified as an expert witness); *United States v. Jimenez-Chaidez*, 96 F.4th 1257, 1267 (9th Cir. 2024) ("[A] lay witness may testify to the information extracted from a phone so long as the testimony does not require specialized knowledge.").

The testimony anticipated by these witnesses is admissible lay testimony under Federal Rule of Evidence 701.  Rule 701 allows a lay witness to offer opinions that are (a) "rationally based on the

UNITED STATES' TRIAL BRIEF

witness's perception," (b) "helpful" to the jury, and (c) "not based on scientific, technical, or other specialized knowledge within the scope of" expert testimony.  Fed R. Evid. 701.  As the Ninth Circuit explained in *United States v. Gadson*, Rule 701 was "a departure from the then-prevailing evidentiary principles governing lay witness testimony, which generally required witnesses to limit their testimony just to the facts they perceived and avoid opinions or inferences based on those facts."  763 F.3d 1189, 1206 (9th Cir. 2014) (citations and quotations omitted).  Instead, Rule 701 recognizes that "the distinction between 'fact' and 'opinion' proved to be unworkable in practice" and any weakness to the lay opinion testimony can be revealed through "cross-examination and argument."  *Id.*  Thus, lay witness testimony that is based on "the witness's direct perceptions *and experience* may [] prove 'helpful to the jury' for purposes of Rule 701."  *Id.* (emphasis added); *see also Tampa Bay Shipbuilding & Repair Co. v. Cedar Shipping Co.*, 320 F.3d 1213, 1222 (11th Cir. 2003) (approving lay opinion testimony when the witnesses "testified based upon their particularized knowledge garnered from years of experience within the field [and] [t]heir testimony was helpful to the district judge and relevant to the issues presented in the case").

A lay witness's opinion is admissible under Rule 701 if it is "based on the witness's day-to-day knowledge of his or her business."  *United States v. Polishan*, 336 F.3d 234, 243 (3d Cir. 2003); *see also Fireman's Fund Ins. Companies v. Alaskan Pride P'ship*, 106 F.3d 1465, 1467 (9th Cir. 1997) (upholding as admissible lay opinion testimony from a claims manager for an underwriter that the claim at issue in the case was "a legitimate loss"); *United States v. Hill*, 643 F.3d 807, 841 (11th Cir. 2011) (under Federal Rule of Evidence 701, officers or employees may offer their lay opinion testimony, not because they are experts, but because of the "particularized knowledge" they have acquired about their own company's business practices); *Ryan Dev. Co. v. Indiana Lumbermens Mutual Ins. Co.*, 711 F.3d 1165-1170 (10th Cir. 2013) (approving testimony of accountant as to company's lost profits under Rule 701 where the accountant prepares such valuations on personal experience with the company, uses basic math, and no outside expert reports); *United States v. Munoz–Franco*, 487 F.3d 25, 35 (1st Cir. 2007) ("Under Rule 701, courts have allowed lay witnesses to express opinions about a business 'based on the witness's own perceptions and knowledge and participation in the day-to-day affairs of [the] business.'").

### 1.   Aleksandr Legkiy, Forensic Accountant

Aleksandr Legkiy is an FBI Forensic Accountant and has Chainalysis Reactor and Chainalysis Ethereum Investigations Certifications.  These certifications demonstrate Mr. Legkiy's training and capacity to analyze and trace complicated cryptocurrency transactions and transfers.  Mr. Legkiy will testify on this area about how cryptocurrency is transferred, and the way in which the delay in transfers may result in different values being sent than those that are received.

Mr. Legkiy conducted a forensic accounting of all bank accounts, transactions, and cryptocurrency wallets that gave rise to the charges against the defendant.  Mr. Legkiy then created several summary charts showing the movement of money into and through the impacted bank accounts and cryptocurrency wallets.  Mr. Legkiy's testimony will be based on his general training and experience and his review and analysis of specific bank records, including images of checks and bank statements, and he is expected to testify about the methods of his analysis and the results of his analysis, showing that Defendant misappropriated investor funds and moved that money into personal accounts belonging to himself and his friends.

### 2.   Nicholas Phirippidis, Special Agent

Nicholas Phirippidis is an FBI special agent, who has spent significant time investigating cyber-crime, including cyber-crime involving cryptocurrency.  Accordingly, he has a broad base of knowledge as a result of his law enforcement training and experience as to cryptocurrency, Bitcoin, and the global nature of cryptocurrency markets and transactions.  He is expected to testify broadly about cryptocurrency transactions.

### 3.   Tanya Konrad, Senior Forensic Examiner

Tanya Konrad is a senior forensic examiner with the FBI.  She has specialized training on the digital searching of computers and smart phones.  Ms. Konrad is expected to testify regarding the procedures and technical methods used to search Defendant's devices and digital accounts.  She is expected to testify regarding his use of software, including Cellebrite, to extract and parse the data from Defendant's devices and accounts.  Such testimony does not require expert certification.  *Jimenez-Chaidez*, 96 F.4th at 1267 (9th Cir. 2024).

UNITED STATES' TRIAL BRIEF                           19

## VII.    OTHER TRIAL ISSUES

### A.    Exclusion of Information and Arguments Regarding Punishment and Other Irrelevant Topics

The United States requests that the Court enter an order on the first day of trial, prohibiting Defendant and his counsel from referring to, in the presence of the jury during voir dire or at trial, either directly or indirectly: (1) any potential penalties or punishment he may face; (2) the collateral effects of a felony conviction on Defendant's ability to do business; and (3) other related arguments designed to appeal to the passions or prejudices of the jury.  These topics are irrelevant to the charges against Defendant.  *See* Fed. Rule Evid. 401(b).  And even if those topics are relevant, their "probative value is substantially outweighed by the danger of unfair prejudice."  Fed. R. Evid. 403.  Discussion of any of these topics would encourage the jury to base its verdict on sympathy rather than the facts of the case.  As the Ninth Circuit Model Jury Instructions provide, jurors must not "be influenced by personal likes or dislikes, sympathy, [or] prejudice."  § 1.1 (Dec. 2022 ed.).  It is also inappropriate for a jury to be informed of the consequences of their verdict.  *United States v. Frank*, 956 F.2d 872, 879 (9th Cir. 1991).  Therefore, the Defendant should be precluded from introducing facts and argument related to the identified topics in this section at any stage of the trial.

### B.    Presentation of Witnesses

It is possible that the government may have to call certain witnesses out of order or recall witnesses to maintain an orderly presentation.  This should provide for an efficient presentation of the evidence and assist the jury, the Court, and the defendant in understanding the evidence being presented.

### C.    Exclusion of Witnesses from the Courtroom Other than the Government's Case Agent

Before the presentation of evidence, the government will move for the exclusion of all witnesses until their testimony has been completed, pursuant to Fed. R. Evid. 615.  The United States will further move that Federal Bureau of Investigation Special Agent Christifer Tomoson be designated as the case agent and thus exempt from the exclusion order, pursuant to Federal Rule of Evidence 615(b); *see also United States v. Little*, 753 F.2d 1420, 1441 (9th Cir. 1984).  In addition, it is anticipated that Paralegal Specialist Samantha Kenny will be present with the United States throughout trial to aid in the

UNITED STATES' TRIAL BRIEF

20

organization and presentation of exhibits.

### D.    Possible Defenses

The defendant has not provided notice of any defenses for which the Federal Rules of Criminal Procedure require notice.  Therefore, the government will move to bar any such defense should it be raised during trial.

### E.    Issues Related to Closing Arguments

As noted above, the defendant should not be permitted to have the jury determine the facts based on improper appeals to sympathy, including regarding possible punishment.

The defendant may call witnesses.  As a corollary, the government may comment on their failure to call relevant witnesses.  "A prosecutor's comment on a defendant's failure to call a witness does not shift the burden of proof, and is therefore permissible, so long as the prosecutor does not violate the defendant's Fifth Amendment rights by commenting on the defendant's failure to testify."  *United States v. Cabrera*, 201 F.3d 1243, 1250 (9th Cir. 2000) (citing cases).  If a defendant does testify, a prosecutor may characterize the defendant's testimony as false. *Id.*

### VIII.    CONCLUSION

The foregoing is a summary of issues that may arise at trial.  Should any legal issues arise that have not been covered in this trial brief, the government respectfully requests leave to submit further briefing as may be necessary.

Respectfully submitted,

Dated:  April 10, 2026

ERIC GRANT
United States Attorney

By:   /s/ *J. Douglas Harman*

J. DOUGLAS HARMAN
JESSICA DELANEY
Assistant United States Attorneys

UNITED STATES' TRIAL BRIEF

21